## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## KNOXVILLE DIVISION

| | | |
|---|---|---|
| DEBRA DENTON, on behalf of herself and all others similarly situated, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | NO. _____ |
| COOPER VISION, INC.; ALCON LABORATORIES, INC.; BAUSCH + LOMB; JOHNSON & JOHNSON VISION CARE, INC.; ABB OPTICAL GROUP; WAL-MART STORES, INC.; COSTCO WHOLESALE CORPORATION; 1-800-CONTACTS.COM; LENSDISCOUNTERS.COM, | ) ) ) ) ) ) ) ) ) | CLASS ACTION

Jury Trial Demanded |
| Defendants. | ) | |

---

### CLASS ACTION COMPLAINT FOR DAMAGES

---

Comes the Plaintiff, Debra Denton ("Plaintiff"), on behalf of herself and all others similarly situated (the "Class"), by and through the undersigned attorneys, and bring this Class Action Complaint for damages and a trial by jury against Defendants Cooper Vision, Inc.; Alcon Laboratories, Inc.; Bausch + Lomb; Johnson & Johnson Vision Care, Inc.; ABB Optical Group; Wal-Mart Stores, Inc.; Costco Wholesale Corporation; 1-800-Contacts.com; and Lensdiscounters.com.

Based upon personal knowledge with respect to their own acts, and as to all other matters based upon the investigation of counsel, for their Complaint, Plaintiff states as follows:

# TABLE OF CONTENTS

I.      INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     JURISDICTION AND VENUE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

III.    PARTIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        A.      Plaintiff. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        B.      Manufacturer Defendants.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        C.      Wholesaler Defendant. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        D.      Retailer Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

IV.     TRADE AND COMMERCE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

V.      FACTUAL ALLEGATIONS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        A.      The Nature of the Products And The Market In Which They Are Sold. . . . . . . . 12

        B.      Prior Efforts By Manufacturers and Independent ECPs To Reduce Price
                Competition For Contact Lenses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        C.      Concentration of the Disposable Contact Lens Market. . . . . . . . . . . . . . . . . . 17

        D.      Implementation of MPRM Agreements Through "UPPs".. . . . . . . . . . . . . . . . 18

                1.      Actions By Manufacturer Defendants. . . . . . . . . . . . . . . . . . . . . . . 18

                2.      Role of ABB and Independent ECPs in Developing and Agreeing to
                        RPM Policies. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

                3.      The Manufacturer Defendants Jointly Agreed to Implement RPM
                        Policies.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

                4.      The Retailer Defendants Agreed to the Manufacturer Defendants'
                        RPM Policies. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

                5.      The RPM Policies and Defendants' Concerted Action Harm
                        Competition. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

6.      There is No Justification for the Manufacturer Defendants' RPM Policies. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

E.      Anticompetitive Effects and Injury. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

VI.    RELEVANT MARKETS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

A.      Relevant Product Markets. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

B.      Geographic Market. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

VII.   CLASS ACTION ALLEGATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

VIII.  CLAIMS FOR RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

IX.    JURY DEMAND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

X.     PRAYER FOR RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

# I. INTRODUCTION

1.    Plaintiff Debra Denton brings this action under the Sherman Antitrust Act, 15 U.S.C. § 1, the antitrust laws of Tennessee, and state common laws of unjust enrichment, on behalf of herself and all persons and entities in the United States who, between June 1, 2013 and the present, purchased disposable contact lenses ("contact lenses")[1] manufactured by the Manufacturer Defendants[2] and subject to a resale price maintenance ("RPM Policy") or Unilateral Pricing Policy ("UPP"), as described herein,[3] directly from the Retailer Defendants.[4]

2.    Plaintiff alleges a multi-faceted, multi-phase conspiracy between, on one hand, the Manufacturer Defendants and ABB Optical Group ("ABB"), a wholesaler, as well as independent eye care professionals ("ECPs") (e.g., optometrists and ophthalmologists who sell contact lenses to consumers) represented by ABB and their trade association, the American Optometric Association

---

[1]For purposes of this complaint, the term "contact lenses" refers to disposable contact lenses. Such lenses, which were introduced to the market in 1987, are the most popular contact lens style in the United States and account for approximately 90% of contact lenses sold in the United States. Alcon's Vice President has admitted that contact lenses are a commoditized product.

[2]The "Manufacturer Defendants" are Defendants Alcon Laboratories, Inc. ("Alcon") (a division of Novartis International AG ("Novartis"); Johnson & Johnson Vision Care, Inc. ("J&J") (which operates in the United States under the "Vistakon" trade name); Bausch + Lomb ("B&L") owned by Valeant Pharmaceuticals, Inc. ("Valeant"); and Cooper Vision, Inc. ("Cooper Vision").

[3]Although the RPM Policy was not unilateral in fact, Defendant J&J describes it as a "Unilateral Pricing Policy" or "UPP."

[4]The "Retailer Defendants" are Wal-Mart Stores, Inc. ("Walmart"), Costco Wholesale Corporation ("Costco"), 1-800-Contacts.com ("1-800-Contacts"), and/or LensDiscounters.com.

("AOA"), and between the Manufacturer Defendants and the Retailer Defendants on the other hand, to impose minimum resale prices on certain contact lens lines and thereby eliminate price competition.

### The Role of ECPs

3. Competition in the contact lens market in the United States is distorted by the unique role played by ECPs. Unlike prescription drugs, which are prescribed by doctors but sold only by pharmacies, ECPs both prescribe and sell contact lenses. In fact, ECPs are the only contact retailers who can legally prescribe contacts for consumers, and once they do so, neither the consumer nor a competing contact retailer can substitute even an equivalent product except in unusual circumstances.

4. ECPs charge consumers a fee determined by the ECP for the service of addressing the consumer's eye condition and determining the appropriate contact lens prescription. In addition to the service or "fitting" fee, many ECPs also fill the prescriptions, making additional profit on the sale of contact lenses.

5. When an ECP writes a prescription for a patient, that ECP prescribes not only the type and power of the lenses, but also the *particular brand*. Unless the patient comes back for another eye exam, or switches ECPs, he or she is locked into buying the prescribed brand of lenses for the length of the prescription, typically one to two years.

6. Because consumers must replace their contacts, sometimes daily, they must therefore make repeated purchases. Retailers, including the Retailer Defendants, obtain much of their business

-2-

from such customers.[5]  Thus, the power to prescribe makes ECPs the "gatekeepers" of the contact

lens market.  They have the power and the economic incentive to prescribe lenses that provide them

the largest profit margins.  The Manufacturer Defendants understand these incentives all too well,

as ECPs will refuse to prescribe a manufacturer's lenses if the ECP's profit margins are undercut by

more efficient retailers, such as mail order and internet companies, or big box stores.  As a result,

the Manufacturer Defendants have always done what they can to insulate ECPs from price

competition.  The economic purpose of the RPM or UPP is to insulate ECPs from price competition

from more efficient distributors.

### *The Role of ABB*

7.      Defendant ABB also plays an important role in the industry.  As its website states,

> "ABB OPTICAL GROUP is the nation's largest distributor of soft
> contact lenses.  We supply more than two-thirds of Eye Care
> Professionals in America with brand name contact lenses; high grade
> ophthalmic and fully customizable Gas Permeable Lenses.

ABB sells primarily to Independent ECPs, as opposed to ECPs employed by chain optical stores such

as LensCrafter.  Independent ECPs charge the highest average prices for contact lenses compared

to any other distribution channel.   ABB's unique role in the industry is buttressed by its

simple-minded focus: raising ECPs' profit margins.  Angel Alvarez ("Alvarez"), ABB's CEO,

describes his company as the "category captain" for ECPs, and says ABB is "helping them manage

---

[5]In the Fairness to Contact Lens Consumers Act ("FCLCA") and studies and rules
implementing it, Congress and the Federal Trade Commission have recognized the unique nature
of the industry, the separation of the contact lens fitting service (and fee) from the retail purchase
of contact lenses, the impact of the prescription on subsequent purchases, and the importance of
intrabrand price competition.  As the FTC stated in 2004, the FCLCA "increases consumers'
ability to shop around with buying contact lenses," and the FCLCA and the FTC's rules prohibit
ECPs from requiring purchase of contacts from themselves or tying the service or service fee to
the purchase.

that [contact lens] portion of their business. . . . . We take very seriously the trust that they have." His stated goal is to help ECPs grow their practices and "make more money."

8.      ABB is not merely a wholesale vendor. It regularly surveys its ECP customers to find out how much they are charging their patients for each different type and brand of contact lenses. ABB then publishes the results of the surveys in its periodic *Retail Price Matrix* publication so that ECPs can make sure their prices are as high as their fellow practitioners. In its *Profit Advisor* newsletter, ABB also advises its ECP customers to charge as much as possible for contact lenses, beyond the RPM floor set by the Manufacturer Defendants. As the biggest customer of the Manufacturer Defendants, ABB acts as an agent for its 19,000 Independent ECP customers. The RPM Policies or UPPs benefit ABB by forcing more consumers to purchase replacement contact lenses from Independent ECPs who are ABB's customers.

### The Role of the Retailer Defendants

9.      In addition to conspiring with ABB, ECPs, and the AOA, the Manufacturer Defendants also conspired with the Retailer Defendants, obtaining the Retailer Defendants' agreements to abide by their RPM Policies, and prohibiting the Retailer Defendants from discounting those products.

10.     As ECPs themselves have acknowledged, this new pricing scheme represents a "fundamental shift" in how contact lenses are sold to consumers. For example, according to Costco's recent antitrust complaint against J&J, Costco objected to J&J's UPP and violated it, which

-4-

resulted in threats from J&J that it would refuse to sell contact lenses to Costco. As a result, Costco agreed to comply with J&J's UPP. In its complaint, Costco admits that its agreement to J&J's UPP "has resulted in substantially higher prices on J&J lenses that Costco sells."[6]

11.     To accomplish their shared goals, the Defendants agreed to alter the contact lens pricing model. Before June of 2013, each Manufacturer Defendant permitted distributors and retailers to determine the prices at which they would sell their contact lenses and did not preclude discounting of such products. Now, each prohibits retailers from selling certain lines of contact lenses below mandated prices. This draconian change in the pricing model would not have occurred absent a conspiracy among the Defendants. Contact lenses are the only prescription medical device sold in the United States pursuant to a RPM Policy or UPP.

12.     As part of this conspiracy, ABB worked with the Manufacturer Defendants to develop RPM Policies for several of the most advanced and most popular lines of contact lenses sold by the Manufacturer Defendants. Over the course of 15 months, commencing in June of 2013, each Manufacturer Defendant implemented this strategy in the form of a minimum resale price maintenance ("MRPM") scheme called a "UPP." Under this scheme, each Manufacturer Defendant promulgated a minimum retail price for its affected product(s) and threatened to curtail the supply of some of its contact lens lines to retailers who sell below the mandated price.[7]

---

[6]Complaint, ¶ 9, *Costco Wholesale Corp. v. Johnson & Johnson Vision Care, Inc.*, No. 4:15-cv-00941 (N.D. Cal.).

[7]Alcon was the first to do so in June of 2013 and expanded the number of contact lenses subject to the policy to four lines in succeeding months. B&L followed suit with respect to one of its major contact lens product lines in February of 2014. J&J took a similar step with respect to at least eight of its contact lens product lines in June of 2014. And Cooper Vision followed suit in September of 2014 with respect to one of its contact lens lines.

13.     In testimony given on July 30, 2014 before the Subcommittee on Antitrust, Competition Policy and Consumer Rights of the United States Senate's Judiciary Committee investigating the practices at issue here ("Senate Hearing"), it was estimated that the RPM Policies implemented by Alcon, J&J, and B&L encompassed 40% of the domestic contact lens market and that the Manufacturer Defendants would extend their UPPs to cover 80% of that market by the end of 2015.

14.     The RPM Policies have to be viewed in the context of successful prior industry efforts to suppress price competition for contact lenses. More than two decades ago, contact lens manufacturers conspired with ECPs to restrict the supply of contact lenses to alternative sources of distribution (*e.g.*, mail-order houses). Many retailers and their agents had engaged in concerted action to restrain competition by restricting other retail competitors and by imposing minimum retail price or resale price maintenance policies. As a result, in 1996, 32 state attorneys general ("AGs") and consumers brought antitrust lawsuits against J&J, B&L, CIBA Vision ("CIBA") (Alcon's predecessor), and the AOA to challenge the illegal conspiracy. The suits were resolved in 2001. The consent decree settling that dispute has expired, and the Manufacturer Defendants, the Retailer Defendants, and their distributors have once again acted in concert to impose minimum retail prices in the contact lens market and to increase prices of contact lenses to consumers, without any corresponding consumer benefit.

15.     Thus, the UPPs represent merely the latest effort by the Manufacturer Defendants, Independent ECPs, and the Retailer Defendants to ensure that discounting of contact lenses does not occur. The victims, just as in 1996, are the tens of millions of consumers who use contact lenses.

-6-

16.     The RPM Policies of the Manufacturer Defendants – followed by RCPs, ABB, the Retailer Defendants, and their various co-conspirators – constitute unreasonable restraints of trade in violation of the Sherman Act, 15 U.S.C. §1.

17.     Defendants' conspiracy has caused Plaintiff and Class members to pay millions of dollars more for contact lenses than they otherwise would have paid.

18.     The concerted action to impose minimum retail prices has been implemented through at least the following:

- Requests, demands, negotiations, and formal and informal understandings between the Manufacturer Defendants, ABB, the AOA, the Retailer Defendants, and others to adopt, implement, and enforce minimum retail prices;

- Agreement by the Manufacturer Defendants, ABB, and their distributors that none of them will sell contact lenses to any retailer that does not follow the RPM Policy; and

- Agreement by the Manufacturer Defendants to reinstate, after a time, suspended retailers who thus indicate their agreement to the minimum retail prices.

## II.  JURISDICTION AND VENUE

19.     Plaintiff brings this action to recover damages, including treble damages, costs of suit, and reasonable attorneys' fees arising from Defendants' violations of § 1 of the Sherman Act (15 U.S.C. § 1), the antitrust laws of Tennessee, and the common law of unjust enrichment.  This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(a) and 1367.

20.     Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15 and 22 and 28 U.S.C. § 1391(b) and (c), because (a) one or more of the Defendants can be found in or resides in this judicial district, (b) had agents in this judicial district, (c) transacted or is licensed to do business

in this judicial district, and (d) because a substantial portion of the affected trade and commerce described below has been carried out here.

### III.  PARTIES

**A.  Plaintiff**

21.     Plaintiff Debbie Denton is a resident of the State of Tennessee and purchased contact lenses manufactured by J&J and sold by Defendant Wal-Mart during the Class Period that were subject to a RPM Policy or UPP.  As a result of the Defendants' actions complained of herein, Denton paid more than she would have for the contact lenses in the absence of Defendants' conspiracy and was damaged thereby.

**B.  Manufacturer Defendants**

22.     Defendant Alcon is a United States company headquartered in Fort Worth, Texas that is owned by Novartis.  Alcon makes eye care products, including contact lenses.  Alcon was the first to adopt an RPM Policy in June of 2013 and expanded the number of contact lenses subject to the policy to four lines in succeeding months. Jim Murphy ("Murphy"), Vice-President of Alcon, described Alcon's RPM Policy in a public podcast as, inter alia, "a win" for the manufacturers and the doctors.

23.     Defendant J&J is a United States company headquartered in Jacksonville, Florida. J&J makes eye care products, including contact lenses.  J&J is the largest manufacturer of contact lenses in the country, selling at least 43% of all lenses sold in the United States.  J&J implemented RPM Policies with respect to at least eight of its contact lens product lines in June of 2014.

-8-

24.     Defendant B&L is a United States company founded in Rochester, New York and now headquartered in Bridgewater, New Jersey; it is now owned by Valeant.  B&L makes eye care products, including contact lenses.

25.     Defendant Cooper Vision is a United States company headquartered in Pleasanton, California.  Cooper Vision makes eye care products, including contact lenses.  In January 2014, Sauflon Pharmaceuticals announced an RPM Policy for the CLARITI family of contact lenses.  In August 2014, Cooper Vision completed its acquisition of Sauflon.  On September 20, 2014, Cooper Vision announced that it would continue Sauflon's RPM Policy for the CLARITI family of lenses.

### C.     Wholesaler Defendant

26.     Defendant ABB is a United States company headquartered in Coral Springs, Florida that has its contact lens manufacturing operation and one of its distribution centers in Alameda, California.  ABB states on its website that it "is the nation's largest distributor of soft contact lenses," and that it "suppl[ies] more than two-thirds of [ECPs] in America with brand name contact lenses, high grade ophthalmic and fully customizable Gas Permeable Lenses."  ABB wholesales the contact lenses sold by the Manufacturer Defendants and services over 19, 000 ECPs nationwide.  According to ABB, in 2014, "In support of independent eye care practitioners, ABB OPTICAL GROUP founder and CEO Angel Alvarez advocates for the introduction of unilateral pricing policies (UPP) on contact lenses."[8]

---

[8]"ABB OPTICAL GROUP Through The Years Timeline," available at http://www.abbconcise.com/ABB_Corporate/Pressroom.aspx#25Years (last accessed March 9, 2015).

-9-

**D.     Retailer Defendants**

27.     Defendant Costco Wholesale Corporation is a Washington corporation with its headquarters in Washington.  Costco describes itself as a membership-based warehouse club with "locations nationwide, but the largest number of its members and locations in any state are in California.[9]

28.     Defendant Wal-Mart Stores, Inc. is a Delaware corporation with its principal place of business at 702 S.W. 8th Street, Bentonville, Arkansas.

29.     LensDiscounters.com is a Delaware corporation with its principal place of business located in Buffalo, New York.

30.     Defendant 1-800-Contacts.com is a Delaware corporation with its principal place of business in Draper, Utah. 1-800-Contacts claims that it is "the largest retailer of contact lenses in the United States," and "has served more than 8 million customers, stocks more than 15 million contact lenses, and delivers more than 200,000 contact lenses every day directly to customers."[10]

31.     Various entities not made defendants in this lawsuit, including but not limited to contact lens distributors, consultants, and ECPs, have participated as co-conspirators with the Defendants in the antitrust and other violations asserted in this Complaint and have performed acts and made statements in furtherance thereof.

---

[9]Complaint, ¶ 13, *Costco Wholesale Corp. v. Johnson & Johnson Vision Care*, Inc., No. 4:15-cv-00941 (N.D. Cal.).

[10]https://www.1800contacts.com/connect/press-releases/1800contacts-breaks-ground-newcorporate-headquarters

32.     Plaintiff reserves the right to name some or all of these persons as Defendants at a

later date.  There is a finite number of co-conspirators and Plaintiff believes that their identities can

be ascertained through Defendants' own records.

## IV.  TRADE AND COMMERCE

33.     In 2013, the retail sales volume of contact lenses in the United States was $4.74

billion, and the number of contact lens wearers was 37 million.  There are four primary contact lens

manufacturers: J&J, which operates under the Vistakon name in the United States; Alcon;

CooperVision; and Bausch & Lomb.

34     In 2013, these four manufacturers accounted for 98.5% of the revenue from contact

lenses in the United States.  Upon information and belief, the Retailer Defendants purchase certain

contact lenses from each of the four.

35.     The Manufacturer Defendant also sell significant volumes of contact lenses to

authorized distributors, several of which indicate that they operate as buying collectives for ECPs.

The primary distributors for J&J include ABB, AC Lens, Diversified Ophthalmics, Imperial Optical,

Nassau Vision Group, The Newton Group, and WVA.

36.     ABB, for example, advertises itself to ECPs as being "dedicated to help you build

profits," providing a "Quarterly Profit Advisor, Retail Price Monitor, [and] personalized business

review."  ABB actively promotes the implementation of RPM Policies and even higher prices and

describes to ECPs how to use minimum pricing to increase revenue.

37.     By law, contact lenses in the United States are sold only by prescription.  The level

of service from ECPs in the prescription process is determined primarily by professional standards

of care and the service fee.  Consumers have no reasonably accessible source of information as to

-11-

variations in ECP services, service charges, or contact lens prices, and J&J has attempted to make that situation even worse by requiring that retailers agree not to advertise prices. Except in limited circumstances, neither the consumer nor the retailer has the power to substitute an alternative or cheaper option to the prescribed brand, such as generic equivalents, severely restricting inter-brand competition at the retail level.

38. During the Class Period, each Manufacturer Defendant (or one or more of its subsidiaries) and ABB sold contact lenses in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

39. During the Class Period, the Manufacturer Defendants collectively controlled a majority of the United States contact lens market.

40. Defendant ABB is the largest distributor of contact lenses in the United States. More than two-thirds of ECPs in the United States purchase contact lenses from ABB.

41. The business activities of the Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.

## V. FACTUAL ALLEGATIONS.

### A. The Nature of the Products And The Market In Which They Are Sold.

42. For purposes of this complaint, the term "contact lenses" refers to disposable contact lenses. Such lenses, which were introduced to the market in 1987, are the most popular contact lens style in the United States and account for approximately 90% of contact lenses sold in the United States. Depending on the contact lens line, these contact lenses are replaced either on a daily, weekly, or monthly basis: daily contact lenses are designed to be worn for a single day; weekly contact lenses are designed to be replaced on a weekly basis; and monthly contact lenses are

-12-

designed to be replaced every one to three months. Contact lenses include both spherical lenses, which contain a single refractive power, and specialty lenses, which are crafted to address specific vision conditions such as toric lenses (for people diagnosed with astigmatism), and bifocal and multifocal contact lenses (for people diagnosed with presbyopia). Contact lenses are a commoditized product.

43.    The United States Food and Drug Administration ("FDA") first approved soft contact lenses in 1971. Disposable contact lenses are a soft contact lens. Since that time, contact lenses have been treated as Class II and Class III pharmaceutical devices that require a prescription from an ECP to purchase. The first generation of contact lenses required significant work on the part of an ECP to fit the lens, and as a result, most consumers purchased their contact lenses directly from their ECP. However, as contact lens technology improved, consumers were able to unbundle the purchase of their lenses from their eye exams because, in the words of a 2005 report by the Federal Trade Commission ("FTC") entitled *The Strength of Competition In The Sale of Rx Contact Lenses: An FTC Study* (the "*2005 FTC Report*"), "the replacement lens a consumer purchases pursuant to a prescription that specifies a brand will be identical, regardless of where it is purchased." However, to make it more difficult for patients to shop for replacement lenses, ECPs often refused to hand over a copy of their patient's prescription.

44.    That situation changed with the December 6, 2003 enactment of the Fairness to Contact Lens Consumers Act ("FCLCA") (15 U.S.C. §§ 7601 et seq.), which requires ECPs to provide patients copies of their contact lens prescriptions automatically so that they can purchase their contact lenses from a retailer other than their ECP. Section 4(f) of the FCLCA (15 U.S.C. § 7603(f)) also barred sellers from altering a contact lens prescription. The legislative history of the

-13-

FCLCA made it clear that the legislation was intended to "promote[] competition, consumer choice, and lower prices by extending to contact lens wearers the same automatic right to copies of their own prescriptions and allows consumers to purchase contact lenses from the provider of their choice."

45.     In 2004, the FTC issued the Contact Lens Rule (16 C.F.R. Parts 315 and 456), which spells out the FCLCA's requirements.  That rule reaffirms that ECPs must give a copy of the contact lens prescription to the patient at the end of every contact lens fitting – even if the patient does not request it.  It contains other requirements that are intended to make it easier for the patient to take his or her prescription to an alternative source in order to reap the benefits of competition.  As the FTC has stated, the FCLCA "increases consumers' ability to shop around when buying contact lenses."

### B.     Prior Efforts By Manufacturers and Independent ECPs To Reduce Price Competition For Contact Lenses.

46.     Because of the price competition engendered by the mass merchandisers and internet retailers, ECPs and contact lens manufacturers have repeatedly attempted to limit their impact.  In 1996, in *In re Disposable Contact Lens Antitrust Litig.*, 170 F.R.D. 524 (M.D. Fla. 1996) (the "*First Contact Lens Litigation*") consumers and 32 state AGs filed antitrust lawsuits against J&J, B&L, CIBA, and the AOA.  These lawsuits alleged that the contact lens manufacturers and the AOA "conspired among themselves . . . to restrict the supply of replacement contact lenses to alternative channels of distribution."   Specifically, the plaintiffs alleged a classic group boycott: that the manufacturers and the AOA restricted wholesale sales to "alternative suppliers" (*e.g.*, mail order houses and pharmacies), and that but-for this conspiracy, the plaintiffs would have paid lower prices for contact lenses.  *In re Disposable Contact Lens Antitrust Litig.*, MDL No. 1030, 2001 WL 493244

-14-

(M.D. Fla. Feb. 8, 2001).

47.    In concluding that the plaintiffs had "proffered ample evidence" to overcome summary judgment, the district court pointed to the following pieces of evidence, among others:

■ "A Vistakon [(now J&J)] memo discussing the agenda for the AOA/Vistakon meeting that took place January 15, 1992 stating, inter alia, 'reduc[ing] the possible trend away from prescribing Acuvue/Surevue as a result of patients'[sic] buying lenses from outlets other then [sic] their own practitioner.'"

■ "A deposition excerpt wherein Vistakon's Consumer Products Director was asked why Vistakon changed its policy, stated 'We couldn't sell our products and doctors were saying to sales reps, 'I am losing patients; therefore, I don't want to put any more new patients in Acuvue because they will walk out of my door.'"

■ "A memo written by Vistakon's D.R. Yadon, given to Vistakon sales personnel which is entitled 'Vistakon Gets Tough on Diverters,' discussing a 'joint effort between the manufacturers and professional organizations to address this [diversion] problem.'"

■ "A Memo written by Craig Scott, Vistakon's Vice President for Marketing to Phillip Keefer discussing 'our action plan' regarding patient retention. . . . The stated objectives were to assist ECPs in retaining patients and to maintain ECPs' 'positive attitude toward fitting new patients with Vistakon products.' The two strategies listed to further those ends were to reduce the supply and the demand for diverted products. The memo went on to discuss, inter alia, disguising the prescription from the patient and also discussed obtaining AOA feedback on the aforementioned proposals."

48.    After the district court denied summary judgment, and following several weeks of trial, the parties settled:

■ B&L paid $8 million into the settlement fund, offered a benefit package valued at $121 to the class members, and agreed to sell its contact lenses to the alternative channels of distribution on a non-discriminatory basis;

-15-

■ J&J paid $25 million into the settlement fund, offered a benefit package valued at $100 to the class members, and agreed to sell its contact lenses to the alternative channels of distribution on a non-discriminatory basis; and

■ AOA paid $750,000 into the settlement fund, agreed to not restrict where consumers could obtain their replacement contact lenses, and agreed not to oppose the release of contact lens prescriptions. AOA also agreed not to make claims that eye health was impacted by the retail channel from which the contact lens was purchased.

49. While this settlement resolved the issues as to the discriminatory practices of J&J, B&L, and Alcon's predecessor, other manufacturers continued to engage in the practices. On September 15, 2006, the Commerce, Trade and Consumer Protection Subcommittee of the House Energy and Commerce Committee held a hearing entitled *Contact Lens Sales: Is Market Regulation the Prescription?* Subsequently, the manufacturer most visibly engaged in restrictive *distribution* policies abandoned the practice, effectively making the need for the legislation moot.

50. Independent ECPs and ABB have engaged in other practices to limit retail price competition. For example, before the Manufacturer Defendants implemented MRPM agreements, ABB not only facilitated the exchange of retail price information among ECPs, but also urged ECPs to adopt uniform pricing.

51. ABB publishes a quarterly pricing survey, called the *Retail Price Monitor*, which calculates average prices for the biggest-selling contact lens lines. The survey relies on the prices of more than 450 practices. The *Retail Price Monitor* "makes it easy" for ECPs to set contact lens prices and "maximize contact lens margins." ABB also operates yourlens.com, which Independent

-16-

ECPs can use to order contact lenses online, and which provides suggested retail prices. As stated in ABB's promotional materials, "Yourlens.com takes the guesswork out of setting your online prices by utilizing our Retail Price Monitor suggested prices."

**C.     Concentration of the Disposable Contact Lens Market**

52.     The Manufacturer Defendants are the four major contact lens manufacturers in the United States.

53.     According to testimony given by R. Joe Zeidner ("Zeidner"), the former General Counsel of 1-800-Contacts, at the Senate Hearing, the four Manufacturer Defendants collectively control 97% of the United States contact lens market, J&J controls 35.3% of the market, Alcon controls 30.6% of the market, B&L controls 7.2% of the market, and Cooper Vision controls 23.9% of the market. As discussed below, all have implemented RPM Policies with respect to some of their contact lens product lines.

54.     The contact lens manufacturing industry has grown even more concentrated in recent years, as large pharmaceutical companies have acquired contact lens manufacturers. For example, in 2011, Novartis acquired Alcon, for roughly $12.9 billion. Similarly, Valent entered this industry through its $8.7 billion acquisition of B&L in August 2013. And in August 2014, Cooper Vision acquired Sauflon Pharmaceuticals Limited.

55.     New entry is not likely to displace this concentration. Barriers to entry, including manufacturing and development costs, as well as regulation by the FDA and states, are high. Apart from the four Manufacturer Defendants, other manufacturers in this market are small and specialize in niche products or contact lenses for specific eye disorders. Profits in the industry have been estimated at 10.1%, with the Manufacturer Defendants enjoying the highest levels of profitability.

-17-

56.     As described below, for purposes of the allegations of this Complaint, the relevant product market is the market for soft (disposable) contact lenses and the relevant geographic market is the United States, given that contact lenses sold in this market are packaged specifically for such sales. This is the market analyzed in the 2005 FTC Report and in its 2004 report entitled *Possible Anticompetitive Barriers To E-Commerce: Contact Lenses (the "2004 FTC Report")*.

### D.     Implementation of MPRM Agreements Through "UPPs"

#### 1.     Actions By Manufacturer Defendants

57.     Alcon was the first of the Manufacturer Defendants to announce an RPM Policy. Although Alcon initially announced an MRPM policy for a single product line, today, Alcon has RPM Policies on four of its contact lens brands. In June 2013, Alcon implemented its first MRPM policy for its DAILIES TOTAL1® contact lenses. In January of 2014, Alcon extended its policy to three other lines: DAILIES® AquaComfort Plus® Multifocal and DAILIES® AquaComfort Plus® Toric contact lenses. And in June 2014, Alcon extended its RPM Policy to AIR OPTIX® COLORS contact lenses. Alcon has sought the written consent of ECPs to its UPPs. According to one optometrist who wrote on "ODs on Facebook," an Alcon representative "made a special appointment with me to discuss UPP and to have me sign paperwork indicating that I understood and agreed to the policy." Another ECP on the same website confirmed that this was Alcon's standard practice.

58.     In February of 2014, B&L implemented an MRPM policy for its ULTRA™ line of contact lenses.

59.     In June of 2014, J&J announced MRPM policies for all of its major contact lens lines. At the same time, J&J announced that it would discontinue contact lens lines that would not be subject to a UPP. The contact lens lines subject to an RPM policy are as follow: 1-Day ACUVUE®

-18-

MOIST®, 1-DAY ACUVUE® MOIST® for ASTIGMATISM, 1-Day ACUVUE® TruEye®, ACUVUE® OASYS® with HYDRACLEAR®, ACUVUE® OASYS® for ASTIGMATISM, and ACUVUE® OASYS® for PRESBYOPIA. These policies became effective on July 1, 2014 for a six-month supply of ACUVUE® OASYS® with HYDRACLEAR® and on August 1, 2014 for the remaining contact lens lines.

60.    According to J&J, its RPM Policies will impact roughly 9.66 million consumers, or 69% of the 14 million consumers of J&J contact lenses.

61.    Laura Angelini ("Angelini"), President of J&J, announced J&J's policy in a written communication to ECPs on June 24, 2014. A trade article described the announcement as follows:

> Last week, in a letter addressed to [ECPs] dated June 24, 2014, Laura Angelini, president, Johnson & Johnson Vision Care – North America, announced the company's launch of its "Enterprise Strategy" and "roadmap for the future," part of which includes resetting the price of specific contact lens products in the U.S. according to a new "unilateral pricing policy." Now, all wholesale customers will receive the same pricing for certain existing contact lenses already offered in the company's portfolio, Angelini told VMail. The policy applies to the company's number one reusable, Acuvue Oasys, its number one disposable, Acuvue Moist, and its 1-Day Acuvue TruEye, which Angelini described as the company's "strategic brands." The new policy also sets minimum retail pricing, which has been communicated to all its customers. In addition, manufacturer's rebates have been eliminated by building those discounts into the retail price of these legacy products rather than requiring customers to send in proof of purchase to obtain rebates. Angelini described this new pricing as a "holistic multifaceted pricing policy to refocus the conversation between the doctor and the patient on eye health and product performance rather than price. This gives the optometrist the ability to improve his or her capture rate in the office," she told VMail. "Now the patient has no incentive to shop around." The letter to [ECPs] described the three areas in which the company would "demonstrate support for the profession and the professional—Prescribers, Portfolio and Preferred Partners." Also in June of 2014, J&J announced that it would discontinue certain

sub-brands of ACUVUE® ADVANCE®, a product line not subject to MRPM policies, on August 1, 2014, and would eliminate the other non-RPM lines on March 31, 2015. A policy letter prepared by J&J and disseminated to its customers made it clear that "[b]ecause an advertisement to beat any price logically commits a reseller to beat even a price that already is below the UPP Price, [J&J] will regard an advertisement promising to beat any price or using similar words to be an advertisement to sell for less than UPP Price."

62.     In September 2014, Cooper Vision became the last major contact lens manufacturer to implement an RPM Policy. Cooper Vision implemented an RPM Policy with respect to its Clariti contact lens line, which it acquired through its purchase of Sauflon, another contact lens manufacturer, for $1.2 billion in August of 2014. In January 2014, Sauflon had instituted a UPP on the Clariti line, and Cooper Vision decided to maintain the UPP after it purchased Sauflon.

63.     Under the RPM Policies, contact lens retailers are not allowed to offer discounts on these lines where the discounted price would be below the RPM Policy price. As Dr. Milicent Knight ("Knight"), head of Professional Affairs for J&J, said at the Senate Hearing, "[r]etailers maintain the right to offer store coupons, rebates or promotions (discounts) under the ACCUVUE Unilateral Pricing Policy, provided that the final net price for the product covered by the UPP remains at or above the UPP Minimum Retail Price, after discounts are applied."

64.     RPM Policies are enforced by the Manufacturer Defendants' threats to cut off supply to retailers that refuse to observe minimum price levels and through other coercive means. As Knight also explained to the United States Senate:

> Johnson & Johnson Vision Care, Inc. has three separate processes for proactive Market Price monitoring. First, there are internal resources (J&J employees) dedicated to researching, confirming and notifying sellers of UPP violations. In addition, Johnson & Johnson Vision Care, Inc. has retained two (2) independent firms to assist in monitoring Market Prices. The first of these firms monitors all

-20-

> on-line pricing and advertising, the second conducts in-store price validations nationwide. All customer types, regardless of size, geography, distribution method, etc. are included in one or more of these monitoring efforts. If a customer is found to be in violation of the UPP, then Johnson & Johnson Vision Care, Inc. will no longer sell products subject to the policy to that customer.

65. J&J expanded on its enforcement measures in a November 5, 2014 circular sent to its customers about its UPPs. That circular stated "[i]f you sell product below the UPP price, [J&J] and its authorized distributors [such as ABB] will refuse to accept new orders from you. In addition, [J&J] will exercise its right to repurchase your current inventory of products subject to the UPP price."

66. In a prepared statement presented at the Senate Hearing, Alcon made a similar point: As a result of this situation, Alcon chose to create an environment in which ECPs might more likely spend time learning about the new technology and explaining it to patients, all while having the opportunity to make a reasonable profit margin. It did so by adopting its RPM, or UPP, when it launched DAILIES TOTAL1® in 2013. That policy provided that Alcon would not supply DAILIES TOTAL1® to customers who resold it for less than the price announced by Alcon.

67. B&L made a similar point in announcing its UPP:

> [E]ach customer is free to advertise or charge whatever price it wants, but should understand that Bausch + Lomb will cease to supply, and will prohibit its authorized distributors from supplying, Bausch + Lomb Ultra® contact lenses to any customer that resells or advertises Bausch + Lomb Ultra® contact lenses to the end consumer (e.g., patient) for sale at less than the MRP.

68. The Manufacturer Defendants actually carry out these threats as to the contact lens lines where the ECP or retailer sells below the UPP. In an article that appeared in the *Review of Cornea and Contact Lenses* in June of 2014, Gerber stated:

-21-

Manufacturers employing UPP have the ability to "cut off" a doctor who does not abide by their pricing policy. Some practitioners question the ability and willingness of manufacturers to enforce these rules. To date, I'm aware of several instances where a manufacturer with a UPP has prohibited an online vendor from selling below the UPP. The hope is that all manufacturers with UPP lenses will follow suit, should other resellers not play by the rules.

69.     Similarly, Alvarez of ABB has stated publicly that the Manufacturer Defendants are very serious about policing their respective RPM Policies and that he knew firsthand that some ECPs had been given a "warning" for violating them. He said manufacturers are "holding the gun" and are willing to lose business in order to police their RPM Policies. Similarly, Murphy of Alcon confirmed that it warns violators that they are selling below the RPM and gives them an opportunity to cure. After a third-party auditor confirms a violation, the retailer is communicated with and "asked to make a correction" within five days. Only if the violator refuses to increase its price does Alcon punish the violation by prospectively denying access to the product for up to one year. The clear implication of Alcon's warning system is that a retailer who has sold contact lenses below the RPM can regain access to the product by agreeing to abide by the RPM.

70.     Alvarez has indicated that "Unilateral Pricing Policy will bring a Fundamental Shift to the optical industry," calling them a "business-focused industry shift that many manufacturers have implemented."

71.     As a result of the Manufacturer Defendants' enforcement of the RPM Policies, the Retailer Defendants agreed to abide by them.

-22-

### 2. Role of ABB and Independent ECPs in Developing and Agreeing to RPM Policies

72.     Independent ECPs colluded with the Manufacturer Defendants in developing the RPM Policies. Independent ECPs did this in order to increase profit margins, combat price discounts from online retailers and big box stores, and eventually, eliminate competition at the retail level altogether. Once that competition is eliminated, independent ECPs will be able to charge whatever price they desire for contact lenses, as the RPM Policies are a *minimum* rather than a *maximum* resale price. The Manufacturer Defendants agreed to collude with independent ECPs because a prescription from an ECP is required for the Manufacturer Defendants to sell their contact lens lines.

73.     Robert Atkinson ("Atkinson"), President of Information Technology and Innovation Foundation, testified at length on the collusion with ECPs at the Senate Hearing (footnotes omitted):

> But how do optometrists convey this desire to prescribe UPP lens to producers? . . . In the case of the eye care industry, the collusion may not be in a smoke-filled room, but it's collusion all the same. In this case, it's professional collusion through norms that is leading producers to adopt UPP policies.
>
> In the optometry profession these anticompetitive social norms are expressed in a variety of means, particularly in articles in professional journals and on social media channels that send a clear message to optometrists that they should prescribe doctors'-only lenses. For example, in an article in Review of Cornea and Contact Lens Gary Gerber, OD, writes:
>
> "One of the biggest benefits to practitioners of UPP is that it instantly creates a perfectly level playing field; volume discounts for large practices and online retailers go away. While this may create friction with buying groups, the benefits outweigh any ancillary issues. More importantly, however, it forces practices to focus on something other than price to keep prescriptions in their office—if all 'retailers' sell the lenses for the same price, the method and environment under which they are sold will be the factors that determine where a patient decides to purchase their lenses.

-23-

He goes [on] to in essence to say, with UPP, optometrists will prescribe the UPP lens:

"Manufacturers also benefit from UPP because retail price erosion can be stopped. With a 'race to the bottom' from aggressive price cutting eliminated, motivations to fit a particular lens increase; this has the ability to support and protect brand equity. . . . All things being clinically equal (which of course they rarely are), savvy practitioners will give serious thought to prescribing UPP lenses.

For example, if you have a patient with astigmatism and they can wear a UPP lens, and a non-UPP lens is clinically equivalent, a smart doctor will choose the UPP option."

Finally, he states what is obvious to everyone in the industry "Finally, the actual price mandated by UPP has so far been higher than lenses that do not have a UPP. This has afforded higher profit margins and created a new sense of excitement surrounding contact lenses." Likewise, in an article in Review of Optometric Business, Paul Karpecki, OD, FAAO writes in favor of UPP, stating "One other exciting development: Independent practice optometry becomes reinvigorated with contact lens prescribing as a profitable specialty and practice differentiator."

We see similar statements on optometrist social media sites. On the Facebook site "ODs on Facebook", a post from a person listed as Steve Silberg (who lists himself as "ODwire.org supporting member") on the topic "J&J goes to universal pricing" writes with regard to having to give "No more rebates etc. and 1-800 etc. goes away if they all follow B&L Alcon and now J & J. Cooper next." In other words he is saying with UPPs competitors like 1-800 Contacts that sell for less will go out of business. And he is not so subtly encouraging Cooper Vision to also use UPP pricing. Another ODwire.org supporting member listed as Stephen McDaniel writes in response to J&J adopting UPP pricing, "Wow, great news. Now I might actually fit more of their lenses. Hopefully Cooper gets on board with this soon." In other words, he is saying that he prescribes lenses based on what level of profit he makes. And he is implying that if CooperVision doesn't also adopt UPP then he will not prescribe their lenses. Another member, listed as Joe DiGiorgio, OD, writes in response to a question of how to tell your patients that these prices of industry regulated lens: , "I think I'll tell my patients that the onliner must have been selling counterfeit contacts. Why else would

> they suddenly raise their prices to what I'm selling them."
>
> And they express this collective desire in meetings with industry representatives. For example, in the Facebook OD site, a person listed as Kerry Kordet Giedd ["Giedd"], writes, "At the Ultra launch last week with 300+ ODs from around the country present there was a Huge applause (honestly, it was quite an overwhelming response) when B&L (Bausch and Lomb) announced the UPP. Without a doubt they were largely pleasing their OD base when they followed Alcon's lead on the UPP. . . . I think B&L will gain far more than they lose in practitioner [sic] loyalty and support of this policy."

Zeidner of 1-800-Contacts gave similar testimony at the Senate Hearing.

74.     ECPs have consistently spoken out in support of the RPM Policies, touting their benefits both to ECPs and to the Manufacturer Defendants. Some of these ECPs are actually employed by the Manufacturer Defendants. Barry Eiden, OD ("Eiden"), for example, told an audience at the Global Contact Lens Forum that the new pricing policies represented "one of the monumental changes in contact lenses in my career." Eiden is employed as a consultant for Manufacturer Defendants Alcon, B&L and Cooper Vision. He is also an Independent ECP and the past Chair of the Contact Lens and Cornea Section of the AOA.

75.     Other Independent ECPs paid by the Manufacturer Defendants have also lent upport to the new pricing policies. For example, Giedd, who is referenced in Atkinson's testimony at the Senate Hearing, pledged her support in industry publications at the same time that she was being paid as a consultant by Alcon and Cooper Vision. Similarly, David L. Kading, OD ("Kading"), who consults for Alcon, stated that the new pricing policies are "fantastic" because they set "an even playing field and it also does not support companies who want to price cut their products in an effort to increase utilization." Kading further stated that "[a]s a doctor, it allows me to let patients know they won't find the lenses cheaper anywhere else."

-25-

76.     ECP support for the RPM Policies is widespread and hardly limited to spokespersons paid by the Manufacturer Defendants. Other ECPs and their agents and trade associations – including ABB, the AOA and state-level optometric associations – have enthusiastically endorsed and supported the Manufacturer Defendants' RPM Policy, recognizing that they signal an end to retail price competition for contact lenses. A poll on Healio.com/Optometry posted after the Senate Hearing queried ECPs regarding the concept of the RPM Policies and, of 204 respondents, 85% said they supported them. Another poll, conducted by ABB, similarly found high approval by ECPs of the RPM Policies. According to Alvarez, 82% of the hundreds of doctors surveyed support them.

77.     The AOA has also been highly supportive of the Defendant Manufacturers' use of MRPM policies. Indeed, David Cockrell, President of the AOA, testified in support of the Manufacturer Defendants' actions at the Senate Hearing, and the AOA submitted written comments in support of those actions. AOA and state associations of optometrists have also been active in opposing legislative efforts in certain states to condemn the Manufacturer Defendants' use of RPM Policies.

78.     J&J publicly acknowledged the role that ECPs played in its formulation of a UPP. Angelini said that J&J was motivated to implement its RPM Policy based on feedback received from ECPs regarding price erosion. In the June 24, 2014 letter addressed to ECPs that is mentioned above, Angelini explained:

> When I last communicated with you about six months ago, I shared
> that Johnson & Johnson Vision Care, Inc., North America (JJVC),
> was in the process of carefully assessing our overall strategy so that
> we could best meet the needs of our customers, and asked for your
> feedback on what we were doing well and areas where we could
> improve. Thanks to your open and candid responses, we were able
> to define our strategy and implement the changes and actions you told

us were needed. . . . You, the [ECP] who prescribes our products, have our unwavering support for your clinical, business, and patient needs. . . . To further demonstrate our commitment to prescribers, beginning this week, many of you will begin to hear from your JJVC Sales Representative about our new pricing strategy within the United States. This includes a Unilateral Pricing Policy (UPP) . . . . We believe the multifaceted nature of this new pricing strategy and the variety of elements that comprise the program will allow you to refocus the critical doctor/patient conversation on eye health and product performance, rather than cost. Also, by removing the complexity of rebates and building these savings into our new pricing, we believe we will be able to reach more patients with instant savings, while providing a simpler approach for everyone.

79.    In a follow-up letter sent by Angelini to ECPs on or about December 17, 2014, he confirmed that J&J had extended an invitation to ECPs a year previously to "share your thoughts" on how J&J "could build and enhance our partnerships to help you meet the evolving needs of your patients and practices. Since then, your open and candid feedback was *instrumental* in helping us create Our Enterprise Strategy," which included the "new pricing strategy" of by J&J's RPM Policy. (emphases added). Angelini welcomed continued feedback from ECPs, promising that they "can reach me and my leadership team at any time . . . ."

80.    Robert Ferrigno, President North America for Cooper Vision, made a similar point in connection with Cooper Vision's adoption of a RPM Policy on one of its product lines, saying his company held twelve focus groups and met with 100 ECPs before acting.

81.    One ECP on Gerber's September 13, 2014 "Power Hour" podcast noted that Manufacturer Defendants' representatives actively counsel ECPs on how to sell contract lenses under the RPM Policies. He stated, "you don't have to push the annual supply, because it doesn't matter – they [the parties] are going to spend the same amount of money, whether they do it in six month increments or two month increments." As the ECP explained, "[s]o, they kind of encourage you to

-27-

get one box out of each eye and go from there."  J&J has also been willing to negotiate the particulars of how large customers implement its RPM Policies, as reflected in the complaint filed in the *Costco Action*.

82.     ECPs have also been instrumental in helping to police the use of UPPs.  The website "ODs on Facebook," for example, gives instances of ECPs informing Alcon's sales representatives about potential violations and requesting them to take action.

83.     ABB played a principal role on behalf of ECPs to cause the Manufacturer Defendants to develop and implement the RPM Policies.  As early as February of 2013 – before any of the Manufacturer Defendants had instituted RPM Policies – Alvarez stated publicly that ABB's focus was to be "aligned with manufacturers."  A subsequent press statement by Alvarez confirmed ABB's integral role in developing the RPMs:

> Angel Alvarez, chief executive officer and founder of ABB Optical Group, issued a statement to PCON regarding the company's stance on UPPs. "*ABB has been working closely with manufacturers to develop [MRPMs]*, which we believe enable a better overall patient experience by supporting competitiveness of prescribing practitioners," Alvarez said.  "Contact lens fitters have always been and will always be a focus of our organization.  We do everything possible to help them succeed." (Emphases added).

84.     ABB also issues publications that allow Independent ECPs (and the Manufacturer Defendants) to monitor the pricing of contact lenses in order to ensure that prices set pursuant to MRPM agreements are being followed.  It publishes a quarterly *Retail Price Monitor* that facilitates this goal.  ABB describes this publication as follows on its website: "[t]he ABB OPTICAL GROUP Retail Price Monitor provides [Independent ECPs] with the retail pricing structure of brand name lenses charged by private practitioners and leading online retailers. . . . The Retail Price Monitor is

a benefit to ECPs looking to consolidate purchasing and maximize margins." As Alvarez stated in

a press release issued in August of 2014, "[o]ur Q3 Retail Price Monitor that will be mailed with our

Profit Advisor newsletter will show ECP's that they can continue to have a retail strategy by

promoting annual supplies and staying within the limits of UPP."

85.     As one ECP put it, "[o]ne of the biggest benefits to practitioners of UPP is that it

instantly creates a perfectly level playing field; volume discounts for large practices and online

retailers go away." This same commentator also agreed that the Manufacturer Defendants "also

benefit from UPP because retail price erosion can be stopped."

86.     The 2014 third quarter issue of the ABB publication *Profit Advisor*, which was sent

to Independent ECPs across the country, stated that the RPM Policies were one of the first

business-focused shifts" in the industry. It went on to advise Independent ECPs to charge more than

the UPP:

> You know that competitors around the corner or the country cannot
> sell their contact lens for less than UPP. ECPs are staying in line, too,
> because the manufacturers are watching them. Sellers who choose to
> ignore UPP policy run the risk of being unable to purchase lenses
> from the manufacturer.
>
> Remember that UPP specifies the lowest price at which a particular
> lens can be sold. Can you sell it for more? Indeed, yes, and I
> encourage you to do so. Increase your price by several dollars--and
> continue using the best strategy of explaining to your patients and
> customers that although they may be paying a few dollars more per
> box, they are receiving the various benefits that you offer. See the
> Soft Lens Retail Price Matrix for a suggested retail pricing strategy
> on the UPP products.

-29-

In fact, I encourage you to adopt a policy of saying that you'll match any legitimate price on these contact lenses. You already know what the price is; it's the UPP price. It won't hurt your bottom line to match the UPP for annual supplies and for the very small percentage of customers who call on you to do so. And I expect that the vast majority of your customers will respond to your value proposition and pay your retail price. Most patients aren't looking for the absolute rock-bottom price.…

As a result of UPP, I believe that the prescribing practitioner will be able to obtain a higher percentage of patient revenue.

87. Alvarez repeated his advice that Independent ECPs charge their customers more than the RPM Policy price in a September 13, 2014 broadcast of the "*Power Hour*" radio hosted by Gerber, saying that ECPs should try to reach a gross profit margin of 48%-49%. Gerber concurred, saying that ECPs "should be charging more [than the MRPM] because they can."

88. Thus, ABB and its cohorts viewed the Manufacturer Defendants' RPM Policies as an occasion to gouge consumers even more for the price of contact lenses than would have been possible prior to the implementation of those agreements, with the hope that many consumers would not realize they were paying a surcharge on the price mandated by RPM Policies that was duplicative of the service fees that they were already paying. And ABB collected data in its *Retail Price Matrix* that facilitated the ability of Independent ECPs to engage in such systematic price-gouging.

### 3. The Manufacturer Defendants Jointly Agreed to Implement RPM Policies.

89. Collectively facing pressure from Independent ECPs and ABB about competitive threats posed by the big box stores, on-line retailers, and club stores, the Manufacturer Defendants agreed with one another and with ABB and the Independent ECPs to impose RPM Policies on their most advanced and most popular contact lenses lines.

-30-

90      There is substantial evidence showing that the Manufacturer Defendants agreed with ABB and ECPs to enter into RPM agreements. There is also substantial evidence showing that the Manufacturer Defendants agreed with one another to enter into RPM agreements. That evidence includes the following.

91.     *Industry Structure Conducive to Collusion.* The four Manufacturer Defendants control 97% of the market for contact lenses. As noted above, the contact lens industry is a mature one with high barriers to entry that involves a commoditized product.

92.     *Opportunities to Conspire.* Some Manufacturer Defendants were members of the Contact Lens Manufacturers' Association ("CLMA") and were the *only* members of the Contact Lens Institute ("CLI"), the activities of which are described below. As members of this Association, the Manufacturer Defendants had regular opportunities to meet, exchange information, and signal intentions to one another. The CLMA hosts an annual meeting, publishes bi-weekly presidential updates to its members, and regularly publishes a newsletter.

93.     *Information Exchanges.* The exchange among competitors of competitively sensitive, non-public information can be indicative of a price-fixing conspiracy and this conduct itself can violate the antitrust laws. Such exchanges occurred in the context of the CLI. According to the CLI's website, it was created to "represent[] the interests of its members . . . ." CLI has no members other than the Manufacturer Defendants. Its board of directors consists of one executive from each of the Manufacturer Defendants. CLI's Chair is J&J's Angelini. Its Vice-Chair is Andrew Sedgwick, Vice-President of Global Commercial Strategy & Business Development for Cooper Vision. Its Treasurer is Richard Weisbarth, Vice-President of Professional Affairs for Alcon. Its Director is Joseph Barr, Vice-President of Clinical and Medical Affairs for B&L.

-31-

Contemporaneously with the Manufacturer Defendants' adoption of RPM Policies, the CLI "newly created" a committee "to develop a collaborative approach by the member companies to help inspire ECPs and their staff to proactively pursue opportunities to fit CLs [contact lenses] and appropriately follow up so that their patients and practice will benefit." The CLI's website further notes that "[t]he members of the CLI, together with other participating companies participate in a quarterly statistical program to track manufacturer shipment data of Contact Lens and Lens Care products which is managed by Veris Consulting ['Veris']. The program's objective is to provide participants with accurate and timely consolidated market data. . . . . Each participating company in the CLI Statistical Program has a representative on the CLI Global Statistical Task Force."

94.     According to Veris' website, the program established by it for the CLI "track[s] sales at a detailed level worldwide" and "is more valuable than other sources of market data because sales are reported directly from manufacturers." Veris states that its work for the CLI "is the only program where the data is reviewed annually by Veris to ensure accuracy. Veris implemented this internal review process to reassure participants that they could be confident in the data." Indeed, Veris requests that "the finance department at each manufacturer's headquarters . . . . [pull sales information and revenue data] directly from their internal system at the model, or SKU level." The resulting low margin of error "is extremely important to participants since they use this data for strategic planning" and is reported to the Manufacturer Defendants on a quarterly and annual basis. According to its website, Karen Eftekari, the person at Veris who is the Senior Manager for this work, "also works with member companies [of CLI] such as Johnson & Johnson and Bausch & Lomb performing high-level data analysis and designing custom reporting tools and dashboards." The CLI functions as one of the vehicles through which the Manufacturer Defendants collude to

-32-

enforce and monitor their respective RPM Policies. The CLI price monitoring program allows the Manufacturer Defendants to keep their fellow manufacturing in line and prevents cheating among the group.

95. *ABB's and Independent ECPs' Conduct*. The Manufacturer Defendants' close relationships with ECPs and with a principal ECP representative, Defendant ABB, enabled the Manufacturer Defendants to collaborate with the ECPs and ultimately with each other to develop the RPM Policies. As noted above, ABB has stated publicly that it "work[ed] closely with manufacturers to develop unilateral pricing policies." Similarly, the Manufacturer Defendants have stated that they collaborated with ECPs to develop the policies. J&J, for example, in its letter to ECPs announcing its RPM Policy, stated that it developed the policy in response to ECP "feedback", that ECPs were "instrumental" in formulating J&J's policy, and that J&J's implementation of that policy "further demonstrates our commitment to [ECPs]." As also noted above, Cooper Vision has admitted that it decided to use a UPP on its Clariti line of contact lenses in direct response to feedback from Independent ECPs. During this collaborative process, on information and belief, ABB and the ECPs communicated to each Manufacturer Defendant its competitors' position on RPM Policies.

96. *Acts Contrary to Economic Self-Interest*. The acts of the Manufacturer Defendants in adopting RPM Policies were contrary to each one's independent economic self-interest. In a candid analyst presentation made on September 11, 2014, Cooper Vision admitted the "Potential Downsides/Challenges" of adopting RPM Policies included:

      (a)     "Enforcement can be challenging";

(b)     "Consumer activism may generate legislative backlash and negative public perceptions"; and

(c)     "May alienate larger customers who want greater pricing freedom and cross marketing."

Yet only days later, it adopted an RPM agreement on its new flagship Clariti line of contact lenses.

97.     The other Manufacturer Defendants faced similar adverse impacts, as reflected in the events of 2014 and early 2015, which included complaints to the FTC, the Senate Hearing, a publicly-revealed investigation by the New York AG into Alcon's adoption of RPM Policies, negative consumer backlash and proposed legislation in various state legislatures. Despite these reasons not to implement RPM Policies, *all four Manufacturer Defendants proceeded to do so*.

98.     Another consequence in 2014 of doing so was slower sales growth, which was certainly contrary to their individual economic self-interests. One industry analyst has noted that United States contact lens sales growth only increased sluggishly by 2% through the third quarter of 2014, a development that it attributed to the implementation of RPM Policies.

99.     Further demonstrating that the Manufacturer Defendants implemented RPM Policies contrary to their individual economic self-interest, Dean Butler, the founder of LensCrafter, has stated that consumers purchase more eye care products – including contact lenses – when shopping online.

100.     Similarly, as noted above, ABB's Alvarez has said publicly that the Manufacturer Defendants are willing to lose business in order to enforce their RPM Policies, something that is not in their independent economic self-interest. The Manufacturer Defendants have tried to justify their conduct by claiming that consumers could be injured by buying contact lenses from shoddy retailers who provide low-quality service. That purported justification is pretextual – a fact that also supports

-34-

an inference of conspiratorial conduct. As a February 18, 2015 article in the *Salt Lake Tribune* noted, when the Chairman of the Utah Senate Business & Labor Committee questioned an industry lobbyist on this purported justification at a legislative hearing held on February 17, the latter "could not provide an example of that ever occurring." Indeed, Carol Alexander ("Alexander"), a Director of Professional Affairs at J&J, stated during this hearing that she could not identify a single instance where a patient was harmed or placed at risk because he or she was able to buy contact lenses from a source other than optometrists. Alexander *admitted* that the adoption of RPM Policy by J&J was not motivated by concerns about patient risk or harm.

101. Similarly, Costco has explained that J&J "asserts this change [adoption of an MRPM policy] is for the benefit of patients – we totally disagree." The allegations of the complaint filed in the *Costco Action* further support this assertion.

102. It was thus contrary to the economic self-interest of any one of the Manufacturer Defendants to attempt to implement an RPM Policy without assurance that its competitors would follow suit. The discounters referred to above collectively possessed sufficient buying power in the contact lens market that no Manufacturer Defendant would be willing to forego those sales or alienate those customers by acting alone. If only some of the Manufacturer Defendants had adopted RPM Policies, discounters such as Costco or Wal-Mart could have shifted market share to those manufacturers that did not dictate a minimum retail price. In fact, after all of the Manufacturer Defendants – except for Cooper Vision – had implemented RPM Policies, Costco sent a letter to its customers informing them of the other Manufacturer Defendants' RPM Policies and urging them to switch to Cooper Vision, only to see Cooper Vision soon thereafter implement an RPM Policy on its flagship Clariti line.

-35-

103.    *Motive to Conspire, Including Assurances That Competitors Will Also Act*.  Each of the Manufacturer Defendants had a motive to maintain high retail prices for its contact lenses.  They were concerned that low retail prices would put pressure on them to lower wholesale prices.  In addition, in order to encourage Independent ECPs to prescribe their contact lenses, the Manufacturer Defendants needed to keep the retail prices high.  ABB – which (a) is the largest distributor of contact lenses in the United States, (b) sells the Manufacturer Defendants' contact lenses to two-thirds of ECPs, and (c) has stated publicly that it "worked with" the Manufacturer Defendants to develop and implement the RPM Policies – was in a position to act as the "hub" in a "hub and-spoke" conspiracy.  That is, ABB was in a position to communicate to each Manufacturer Defendant before it implemented an RPM Policy that its competitors also intended to do so.

104.    *Abrupt, Near-Contemporaneous and Fundamental Shift in Pricing Policies*.  Before June of 2013, none of the Manufacturer Defendants restricted the minimum retail price of its contact lenses.  After Alcon imposed the first RPM Policy in June of 2013, all of its competitors followed suit within 15 months.  As Alvarez of ABB, put it, the RPM Policies represent a "Fundamental Shift" in the contact lens market.  As noted above, contact lenses are the only prescription medical device sold in the United States pursuant to an RPM Policy.

105.    *Past Conspiratorial Conduct*.  The Manufacturer Defendants and Independent ECPs have also demonstrated a past propensity to conspire against discounting retailers of contact lenses, as reflected in the discussion above of the *First Contact Lens Litigation*.

### 4. The Retailer Defendants Agreed to the Manufacturer Defendants' RPM Policies

106. Each of the Retailer Defendants agreed to implement and follow the Manufacturer Defendants' RPM Policies.

107. On or about July 29, 2014, 1-800-Contacts posted the following on its website:[11]

**What is the Unilateral Pricing Policy (UPP)?**
by 1-800 CONTACTS
K Posted on July 29, 2014

**What is UPP?**

UPP stands for Unilateral Pricing Policy. It means the manufacturers of your contact lenses are mandating the minimum price they can be sold for. Because of this, we aren't able to offer any discounts, rebates, or incentives like we used to.

**Why is this happening?**

UPP allows contact lens manufacturers to dictate the price their contact lenses are sold for, effectively eliminating marketplace competition and your ability to shop for the best price. UPP will cause the price of contact lenses to increase drastically – in our case, up to 34%.

**My price has increased a lot from my last order. Why have the prices changed?**

We at 1-800 CONTACTS are committed to protecting your right to buy the quality lenses you expect at the competitive prices you deserve. We obtain all the contact lenses we sell directly from the manufacturer to ensure that our customers receive the highest quality product. When contact lens manufacturers mandate the minimum price for which their products can be sold, we aren't allowed to lower the price or offer any kind of rebates on brands affected by this mandate.

---

[11]http://www.1800contacts.com/connect/featured-articles/what-is-unilateral-pricing-policy-upp

**You used to beat any price by 2%. Why don't you do that anymore?**

We have always stood behind our commitment to beat any price by 2%. While we continue this practice on a large portion of our inventory, manufacturer mandated pricing policies have forced us to discontinue this pricing benefit. We aren't allowed to lower the price or offer any kind of discounts or rebates on products affected by UPP. **You are the same price as my doctor. I thought you would be better.**

The Unilateral Pricing Policy created by manufacturers sets the minimum price that contacts can be sold for, which restricts our ability to offer a lower price than doctors on those lenses. However, we do offer free torn lens replacement, 24/7 customer service, free exchanges if your prescription ever changes, and a 100% satisfaction guarantee. So while our price is similar because of the manufacturer mandate, we still offer services that your doctor doesn't and at no extra cost.

108. 1-800-Contacts admitted that, as a result of its agreement to the Manufacturer Defendants' RPM Policies, "we aren't able to offer any discounts, rebates or incentives like we used to." 1-800-Contacts further stated that its prices had risen up to 34% as a result.[12]

109. 1-800-Contacts states that the following contact lenses are subject to the RPM Policies:[13]

| MANUFACTURER | PRODUCT |
|---|---|
| Bausch & Lomb | ULTRA |
| Alcon | DAILIES TOTAL 1 |
| Alcon | Air Optix Colors |
| Alcon | Dailies AquaComfort Plus Toric |

[12]http://www.1800contacts.com/connect/featured-articles/what-is-unilateral-pricing-policy-upp

[13]http://www.1800contacts.com/connect/featured-articles/what-is-unilateral-pricing-policy-upp

| Alcon | Dailies AquaComfort Plus Multifocal |
|---|---|
| Vistakon | 1-DAY ACUVUE MOIST |
| Vistakon | 1-DAY ACUVUE MOIST for ASTIGMATISM |
| Vistakon | 1-DAY ACUVUE TruEye |
| Vistakon | ACUVUE OASYS |
| Vistakon | ACUVUE OASYS for ASTIGMATISM |
| Vistakon | ACUVUE OASYS for PRESBYOPIA |

110.    1-800-Contacts thus admits that its prices are the same on contacts lenses as those prices charged by ECPs.

111.    Lensdiscounters.com states on its website:[14]

**ABOUT UNILATERAL PRICING POLICIES**

**What is UPP?**

UPP (Unilateral Pricing Policy) is a strategy used by certain contact lens manufacturers, requiring retailers such as ourselves to price their products at a manufacturer's specified minimum price. Retailers who do not comply will no longer be supplied by the manufacturer.

**Why do manufacturers want a UPP?**

Under the guise of price equality, manufacturers want to give eye care practitioners incentive to prescribe their products vs their competitor's products on the basis that the patient will be more likely to buy directly from the doctor if the prices for that contact lens are the same online or elsewhere. Initially, this might seem like a fair practice, but it prevents free market pricing -- and in the end, results in higher pricing to you, the end consumer.

112.    Lensdiscounters.com further explains:[15]

---

[14]http://www.lensdiscounters.com/upp.html

[15]*Id.*

**Which contact lens companies have a UPP?**

Alcon has already adopted the UPP to their Dailies Total 1 and will soon implement it on some of their new products. Johnson & Johnson, the manufacturer of Acuvue Oasys lenses, has implemented a UPP program as of July 2014. We anticipate that other contact lens companies will follow suit in the future.

**Will I be paying more for my lenses?**

Rest assured, we will continue to sell at the lowest allowable price to our customers and continue to offer the reliable service that you've come to expect from us. We suggest that on your next visit to the eye doctor, you ask to be fit into a lens that doesn't have any dictated minimum pricing, ensuring that you can still take advantage of the lowest prices for contacts lenses online at LensDiscounters.com. You need to be sure that your doctor is prescribing you a certain lens because it's best for you, not best for their pocket book.

**What can I do about the UPP?**

As suggested above, asking to be fit for an alternative brand that doesn't have a UPP will keep you from having to pay the higher price. If you are unable to switch, or just prefer the lenses you are currently wearing -- you can make a statement by purchasing the lenses online through us even if the prices are the same at your doctor. We're just a click away, and we save you time by not having to go anywhere to get your lenses and we're good at what we do!

 At LensDiscounters.com, we strive to provide a fair and transparent shopping experience to all of our customers and do not believe price controls are in the best interest of our customers. We will do what we can to fight these pricing policies and keep eyecare affordable for our customers. We will continue to keep you informed and will have more information about UPP soon.

113.     Lensdiscounters.com thus admits that its agreement to the RPM Policies "results in higher pricing to . . . the end consumer."[16]

---

[16]*Id.*

114.     As reflected above, Costco filed suit against J&J for its imposition of an RPM Policy. Nonetheless, Costco has admitted that it has agreed to follow the policy and that its agreement to the RPM Policy "has resulted in substantially higher prices on J&J lenses that Costco sells."[17]

115.     Costco alleges that "[t]he concerted action has injured . . . competition, and consumers, including Costco members, through decreased competition, increased prices and administrative costs, and reduced choice, quality, innovation, and output.[18]

### 5.     The RPM Policies and Defendants' Concerted Action Harm Competition.

116.     Defendants' agreement to implement RPM Policies has harmed and continues to harm competition by increasing prices for the contact lenses made subject to them.  Consumers ultimately pay the economic cost of this wrongful conduct in the form of higher prices for contact lenses affected by RPM Policies.

117.     At the Senate Hearing, Zeidner presented a graphic showing a range of a 40% to 112% difference between the lowest internet price for J&J's affected products and its UPP price.

118.     George Slover, Senior Policy Counsel for the Consumers' Union, and Atkinson gave similar testimony at the Senate Hearing.

119.     Zeidner noted that as of July of 2014, MRPM policies encompassed 40% of the market and predicted 80% coverage by the end of 2015, especially with ECPs writing prescriptions for contact lenses subject to the policy.  As noted above, since his testimony at the Senate Hearing, CooperVision adopted an RPM policy on one of its contact lens lines.

---

[17]Complaint, ¶ 9, *Costco Wholesale Corp. v. Johnson & Johnson Vision Care, Inc.*, No. 4:15-cv-00941(N.D. Cal.), Mar. 2, 2015, ECF No. 1.

[18]*Id.*, ¶ 80.

-41-

120.     Similar testimony was given by Jay Magure ("Magure"), the Vice-President of Governmental Affairs for 1-800-Contacts, at the aforementioned February 17, 2015 hearing before the Utah Senate Business & Labor Committee.  He noted that because of J&J's adoption of RPM Policies, 1-800-Contacts was compelled to eliminate rebates of between $15 and $100 on numerous J&J ACUVUE® products.  The result was that it effectively was forced to raise prices on the vast majority of the contact lenses it sells that are subject to RPM Policies.

121.     In a January 24, 2015 article, Oregonlive.com corroborated this point with a real-world example, noting how 1-800-Contacts sold a 90-lens box of J&J ACUVUE® MOIST® contact lenses a year ago at a price as low as $57.49, but the same product is now sold by it for a low of $63.74.  In his aforementioned testimony, Magure noted that a survey of 780 doctors conducted by 1-800-Contacts both before and after J&J's implementation of RPM Policies confirmed that prices for J&J contact lenses subject to such RPM Policies increased by 57% when compared to pre-UPP levels.

122.     Similarly, the website <stoppupp.org> has published this comparison of J&J's December 2013 contact lens prices (accounting for rebates and mail-in coupons) and its post-UPP prices:

| J&J Product | Old Price | UPP Price | % Change |
|---|---|---|---|
| 1-Day ACUVUE® MOIST® (30 Lenses) | $13.80 | $33.00 | + 139 percent |
| 1-Day ACUVUE® MOIST® (90 Lenses) | $36.49 | $63.50 | + 74 percent |

| | | | |
|---|---|---|---|
| 1-DAY ACUVUE® MOIST® for ASTIGMATISM (30 Lenses) | $18.24 | $34.50 | + 89 percent |
| 1-Day ACUVUE® TruEye® (90 Lenses) | $47.75 | $82.50 | + 73 percent |
| ACUVUE® OASYS® with Hydraclear Plus (12 Lenses) | $22.68 | $67.50 | + 198 percent |
| ACUVUE® OASYS® with Hydraclear Plus (24 Lenses) | $44.23 | $110.00 | + 149 percent |
| ACUVUE® OASYS® for ASTIGMATISM (6 Lenses) | $21.74 | $40.00 | + 84 per cent |
| ACUVUE® OASYS® for PRESBYOPIA | $22.96 | $40.00 | + 74 per cent |

123.    The effect of RPM Policies is reflected on the websites of internet retailers of contact lenses.  In response to the questions about why it no longer beats the prices of others for contact lenses by 2% and why it charges the same as doctors, 1-800-Contacts' website states:

> We have always stood behind our commitment to beat any price by 2%.  While we continue this practice on a large portion of our inventory, manufacturer mandated pricing policies have forced us to discontinue this pricing benefit.  We aren't allowed to lower the price or offer any kind of discounts or rebates on products affected by UPP. . . . The [UPP] created by manufacturers sets the minimum price that contacts can be sold for, which restricts our ability to offer a lower price than doctors on those lenses.

124.    Similarly, the website of LensDiscounters.com has this to say about RPM Policies:

> UPP (Unilateral Pricing Policy) is a strategy used by certain contact lens manufacturers, requiring retailers such as ourselves to price their products at a manufacturer's specified minimum price. Retailers who do not comply will no longer be supplied by the manufacturer. . . . Under the guise of price equality, manufacturers want to give eye care practitioners incentive to prescribe their products vs. their competitor's products on the basis that the patient will be more likely to buy directly from the doctor if the prices for that contact lens are the same online or elsewhere. Initially, this might seem like a fair practice, but it prevents free market pricing -- and in the end, results in higher pricing to you, the end consumer. . . . .At LensDiscounters.com, we strive to provide a fair and transparent shopping experience to all of our customers and do not believe price controls are in the best interest of our customers. We will do what we can to fight these pricing policies and keep eyecare affordable for our customers. We will continue to keep you informed and will have more information about UPP soon.

125. Likewise, 1-800-GET-LENS told its customers that "Bausch & Lomb has implemented a Unilateral Pricing Policy (UPP) on all retailers, both online and bricks and mortar. The UPP prevents anyone from selling Bausch & Lomb products below a certain price." A representative for Costco testified before the Washington Senate Health Care Committee on February 16, 2015 that the Manufacturer Defendants' implementation of RPM Policies has caused it to raise prices on affected contact lenses by as much as 35%.

126. In mid-2014, Costco conducted an analysis of its prices for Alcon's DAILIES TOTAL1 contact lenses before and after Alcon implemented RPM Policies. It concluded that the price for a 90-lens pack increased from $85.00 to $95.00. It also examined J&J prices, and concluded that J&J's MPRM policy required Costco to raise its prices an average of 26%. Costco makes similar allegations in the *Costco Action*.

127. Gerber, in his article quoted above, also confirms that RPM Policies have the effect of elevating contact lens prices. Indeed, at a January 29, 2015 hearing before the Mississippi Senate

Public Health & Welfare Committee, 1-800-Contacts presented econometric evidence that the use

of RPM Policies going forward could cost contact lens consumers as much as $2 billion annually.

Defendants' conspiracy has thus caused Plaintiff and members of the Class to pay supracompetitive

prices for contact lenses and has substantially eliminated price competition in the market.

### 6. There is No Justification for the Manufacturer Defendants' RPM Policies.

128. In *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007)

("*Leegin*"), the Supreme Court identified three factors to be used in determining whether an RPM

program is unreasonable: (a) whether several competing manufacturers adopt RPM programs; (b)

whether retailers play a role in instigating RPM programs; and (c) whether manufacturers or retailers

have market power. *Id*. at 897-98. The Court made it clear that "the potential anticompetitive

consequences of vertical price restraints must not be ignored or underestimated." *Id*. at 894.

129. The *Leegin* factors are satisfied here. Alcon, J&J, Cooper Vision, and B&L have all

adopted RPM Policies. Collectively, the Manufacturer Defendants control 97% of the domestic

contact lens market (by revenue). Independent ECPs also prescribe the majority of contact lenses

sold in the United States. Under *Leegin*, these facts alone are sufficient to justify stricter scrutiny.

130. The second factor is also satisfied. Independent ECPs and ABB played a significant

role in instigating manufacturers to adopt RPM Policies. ABB worked with all four Manufacturer

Defendants to impose the RPM Policies. As the dominant distributor in the market, ABB has the

power to foreclose price competition. In addition, J&J stated that it developed its RPM Policy after

listening to ECPs' "feedback" and they were "instrumental" in the creation of that policy. Cooper

Vision has also admitted as much. This is consistent with Independent ECPs' other conduct aimed

-45-

at keeping out low-cost competitors, including their campaign in the 1980s and 1990s to boycott mail-order contact lens suppliers, their public opposition to sales of contact lenses by nontraditional retailers, and their resistance to giving patients their prescriptions, as required by federal law.

131.     Nor do the RPM Policies have any procompetitive justification.  These policies do not prevent free-riding because the ECP is compensated for his or her services (the eye examination), even if the patient fills the prescription elsewhere.  As noted above, concerns about harm to patients from buying contact lenses from other than ECPs are pretextual and do not justify the anticompetitive conduct claimed here.  Furthermore, the Manufacturer Defendants' RPM Policies do not encourage ECPs to focus more on patient needs instead of contact lens costs.  Instead, they do just the opposite; as several ECPs have said, a "savvy" ECP will always prescribe a contact lens subject to a RPM agreement over another one, because the ECP will earn a greater profit.

### E.     Anticompetitive Effects and Injury

132.     Multiple studies conducted prior to implementation of the RPM Policies found that contact lenses were cheaper when purchased online or from big-box stores as opposed to independent ECPs.

133.     As noted in the 2004 FTC Report, a 1998 study found that the average price of a six-lens pack of contact lenses was roughly 19 percent more expensive when purchased from an independent ECP instead of from one of the other categories of retailers.

134.     The 2004 FTC Report also presented a March 2004 study by 1-800-Contacts reflecting similar results, which are set forth below.

135.     In the 2005 FTC Report, the FTC examined the prices of a six-month supply of ten different contact lenses from 20 online retailers (including four hybrid retailers, or retailers with both

-46-

an online and offline presence) and from 14 offline retailers in Northern Virginia. It found that contact lenses are, on average, "$15.48 less expensive online than offline" and that "[w]holesale clubs . . . [were] the least expensive channel overall, offering prices that averaged around $30 less than independent ECPs, around $9 less than all online outlets, and about $6 less than pure online retailers." The cumulative results of this study are set forth below.

136. Based in part on this study, the FTC concluded that the FCLCA's provision requiring ECPs to provide the patient with a prescription that the patient can then use elsewhere had increased competition and reduced contact lens prices across the country.

137. The significant price disparities between ECP pricing and mass merchandiser and on-line retailers (and resulting savings for the consumer) continued until the Defendants imposed RPM Policies.

138. After the imposition of the RPM Policies, the anticompetitive concerted action has harmed consumers, most directly by increasing the prices they pay for contact lenses.

139. For example, prior to J&J's RPM Policy, Costco's prices for contact lenses were generally 25 to 30% lower than those of many competitors. 1-800 Contacts similarly reported that, for example, for one J&J brand, ACUVUE Oasys, it was forced to increase its prices about 30% as the result of J&J's RPM Policy. *Consumer Reports*, an independent nonprofit organization, also analyzed the RPM Policies and found that they do not provide any benefits and only increased prices for consumers.

-47-

## VI.  RELEVANT MARKETS

### A.     Relevant Product Markets

140.    Where, as here, Defendants have engaged in a *per se* violation of Section 1 of the Sherman Act, no allegations with respect to the relevant product market, geographic market, or market power are required.

141.    To the extent such allegations are required, the relevant markets include (1) the upstream market for contact lenses available at wholesale ("Wholesale Contact Lens Market"), and (2) the downstream retail markets for each brand and type of contact lens ("Retail Contact Lens Markets").  The Wholesale Contact Lens Market and Retail Contact Lens Markets are collectively referred to herein as the "Contact Lens Markets."

142.    The Wholesale Contact Lens Market is a cognizable antitrust market.  The boundaries of the Wholesale Contact Lens Market are determined by the low cross-elasticity of demand between contact lenses and potential substitutes.  A small non-transitory increase in price for contact lenses would not cause consumers of contact lenses to switch to glasses or any other product or service to correct the consumer's vision in sufficient numbers to defeat the price increase.

143.    The Wholesale Contact Lens Market is highly concentrated, with only four main competitors, and concentration has been increasing. J&J has market power.  J&J's current market share is at least 43%, Alcon's is approximately 23%; Cooper Vision's is approximately 22%; and Bausch & Lomb's is approximately 11%.  According to Costco, J&J's market share underestimates J&J's actual market power given such factors as the high barriers to entry and high concentration in the Wholesale Contact Lens Market.

-48-

144.    The Wholesale Contact Lens Market has high barriers to entry.  The design and manufacture of contact lenses requires complex technology, know-how, and skilled labor that takes years to develop.  Manufacturers bear substantial up-front research and development costs as well as significant facility and other infrastructure costs.  Entry barriers for contact lens manufacturers include patents and necessary regulatory approvals.  The cost of competing in the Wholesale Contact Lens Market includes significant costs for marketing and advertising.

145.    The Retail Contact Lens Markets are cognizable antitrust markets.  The boundaries of the Retail Contact Lens Markets are determined by the low cross-elasticity of demand between contact lenses and potential substitutes.  Because a retailer cannot substitute for the prescribed brand and type of contact lens, the retail markets are limited to each brand and type of contact lens that can be prescribed.

146.    A small non-transitory increase in price for contact lenses would not cause consumers of contact lenses to switch to glasses or any other product or service to correct the consumer's vision in sufficient numbers to defeat the price increase.  Nor would a small non-transitory price increase cause contact lens distributors or retailers to otherwise change their activities sufficiently to make such a price increase unprofitable to a manufacturer with market power.  Consumers are unable to constrain market abuses because the ECP prescribes the brand and type.

147.    Today, consumers with a prescription from an ECP can purchase their contact lenses from a variety of sources, including independent ECPs, national optical chains (*e.g.*, LensCrafters), mass merchandisers (*e.g.*, Wal-Mart and Target), wholesale clubs (*e.g.*, Costco), and\online retailers (*e.g.*, 1-800-Contacts and LensDiscounters.com).

148.     Cumulatively, 35 million Americans spend roughly $4.2 billion per year on contact lenses in these various retail channels.

149.     The 2005 FTC Report presents data from both Ocular Sciences, Inc. ("OSI") and 1-800-Contacts on the share of filled prescriptions and sales for contact lenses through these various retail channels.  The OSI figures were as follows:

| Retailer Type | Share of Patient Visits | Estimated Share of Filled Prescriptions |
|---|---|---|
| Independent MD | 14.1% | 12.3% |
| Independent OD | 52.6% | 45.8% |
| Independent Stores and OD Groups | 12.2% | 10.6% |
| Chain Retailers and Optical Stores | 21.0% | 18.4% |
| Mail Order/Internet | n/a | 13.0% |

150.     The data presented by 1-800-Contacts were as follows:

| Channel | Estimated Share of Filled Prescriptions |
|---|---|
| Independent MD | 4.3% |
| Independent OD | 64.3% |
| Mass Merchandisers | 13.0% |
| Chain Retailers | 9.5% |
| Mail Order/Internet | 8.0% |

151.     The FTC concluded that both sets of data told the same story: "Manufacturers distribute the largest share of lenses through independent ECPs and the smallest through the online/mail-order channel."

-50-

152.    A more recent Industry survey has estimated that retail chains' and mass merchandisers' share of contact lens sales will reach 20.5% on 2015, while online retailers' share will reach 9.2%.

**B.      Geographic Market**

153.    The geographic market is the United States.  Because of legal restrictions on contact lens prescriptions, the Manufacturer Defendants package their products specifically for the U.S. market.

## VII.  CLASS ACTION ALLEGATIONS

154.    Plaintiff brings this action both on behalf of herself, and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b) (3), on behalf of the following class (the "Class").

> All persons in the United States who purchased disposable contact lenses manufactured by Alcon Laboratories, Inc., Johnson & Johnson Vision Care, Inc., Bausch + Lomb, and/or CooperVision, Inc. directly from Defendants Wal-Mart Stores, Inc., Costco Wholesale Corporation, 1-800-Contacts, Inc., and/or LensDiscounters.com between June 1, 2013 and the present (the "Class Period"), where the prices for such contact lenses were set pursuant to a Resale Price Maintenance Policy ("RPM") or "Unilateral Pricing Policy" ("UPP"), as described herein.

> Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, all governmental entities, and any judges or justices assigned to hear any aspect of this action.

155.    The Class includes a subclass of persons located in Tennessee who purchased disposable contact lenses subject to RPM Policies.  The Plaintiff therefore brings this action on behalf of herself and a Tennessee subclass consisting of the following:

-51-

All persons in the State of Tennessee who purchased disposable contact lenses manufactured by Alcon Laboratories, Inc., Johnson & Johnson Vision Care, Inc., Bausch + Lomb, and/or CooperVision, Inc. directly from Defendants Wal-Mart Stores, Inc., Costco Wholesale Corporation, 1-800-Contacts, Inc., and/or LensDiscounters.com between June 1, 2013 and the present (the "Class Period"), where the prices for such contact lenses were set pursuant to a Resale Price Maintenance Policy ("RPM") or "Unilateral Pricing Policy" ("UPP"), as described herein.

Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, all governmental entities, and any judges or justices assigned to hear any aspect of this action.

155.    Plaintiff does not know the exact number of Class members because such information is in the exclusive control of Defendants. Plaintiff believes that, due to the nature of the trade and commerce involved, there are most likely hundreds of thousands of Class members, geographically dispersed throughout the United States, making joinder of all Class members impracticable.

157.    Plaintiff's claims are typical of the claims of the Class in that Plaintiff purchased contact lenses subject to a Manufacturer Defendant's RPM Policy. All Class members were damaged by the same wrongful conduct of Defendants and their co-conspirators as alleged herein, and the relief sought is common to the class.

158.    Numerous questions of law or fact arise from Defendants' anti-competitive conduct that is common to the Class, including but not limited to:

    a.    Whether the Manufacturer Defendants engaged in a contract, combination, and/or conspiracy among themselves and with ABB to fix, raise, maintain, or stabilize prices of contact lenses sold in the United States;

-52-

b.  Whether the Manufacturer Defendants' RPM Policies operated as unreasonable restraints of trade;

c.  Whether the Retailer Defendants engaged in a contract, combination, and/or conspiracy with the Manufacturer Defendants to fix, raise, maintain, or stabilize prices of contact lenses sold in the United States;

d.  Whether Defendants' conduct caused the prices of contact lenses sold in the United States to be sold at artificially high and supra-competitive levels;

e.  Whether Plaintiff and the other members of the Class were injured by Defendants' conduct, and, if so, the appropriate class-wide measure of damages for Class members; and

f.  The scope of any injunctive relief to which Plaintiff and the other members of the Class are entitled.

159.  These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual Class members.

160.  Plaintiff's claims are typical of the claims of the Class because Plaintiff purchased contact lenses covered by one or more of the Defendants' RPM Policies.

161.  Plaintiff will fairly and adequately represent the interests of the Class in that she has no conflict with any other members of the Class. Furthermore, Plaintiff has retained competent counsel experienced in antitrust, class action, and other complex litigation.

162.  Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

163.  This class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy. Prosecution as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class

-53-

action. Prior class action litigation involving similar conduct with respect to a similar consumer class and the same products was successfully managed through trial in the *First Contact Lens Litigation*.

164. The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## VIII. CLAIMS FOR RELIEF

### COUNT ONE

### SHERMAN ACT VIOLATIONS, 15 U.S.C. § 1

165. Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

166. Beginning in June of 2013 and continuing to the present, Defendants have engaged in a conspiracy and agreement in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

167. The Manufacturer Defendants implemented RPM Policies in concert with each other and with Independent ECPs, acting, in part, through Defendant ABB, which is complicit in their implementation. Non-ECP vendors of contact lenses are coerced into abiding by the RPM Policies or suffer the loss of the ability to sell the products covered by them. The Manufacturer Defendants agreed, at least tacitly, among themselves to start using RPM Policies, recognizing that the policies could be enforced only if all of them implemented RPM Policies. The Manufacturer Defendants also conspired with Defendant ABB to implement RPMs. The Retailer Defendants agreed to abide by the RPM Agreements as evidenced by their continued sale of the Manufacturer Defendants' products.

-54-

168.     As a result of Defendants' unlawful conduct, prices for contact lenses subject to RPM Policies were raised, fixed, maintained and stabilized in the United States.

169.     As a result of Defendants' unlawful conduct, Plaintiff and the other members of the Class have been injured in their businesses and property in that they have paid more for contact lenses than they otherwise would have paid in the absence of that conduct.

170.     With respect to their claim under the Sherman Act, Plaintiff seeks injunctive relief, treble damages, and attorneys' fees and costs.

## COUNT TWO

## VIOLATION OF TENNESSEE TRADE PRACTICES ACT

171.     Plaintiff repeats and re-alleges each of the foregoing paragraphs, as if set forth verbatim herein.

172.     The Tennessee Trade Practices Act ("TTPA") permits any person injured directly or indirectly, like Plaintiff Debra Denton and similarly situated Class members, to seek redress for their injuries arising out of illegal conspiracies.  Specifically, Tenn. Code Ann. § 47-25-106 provides that:

> Any person who is injured or damaged by any such arrangement, contract, agreement, trust, or combination described in this part may sue for and recover, in any court of competent jurisdiction, from any person operating such trust or combination the full consideration or sum paid by the person for any goods, wares, merchandise, or articles, the sale of which is controlled by such combination or trust.

173.     The TTPA is triggered not by anti-competitive conduct but by the effect of the anti-competitive conduct on Tennessee trade and commerce.  The TTPA's applicability, whether invoked by Tennessee residents or by non-residents, should be judged by whether the alleged anti-competitive conduct affects Tennessee trade or commerce to a substantial degree. Here, Plaintiff

-55-

and the Class are Tennessee resident consumers who charge the Defendants with entering into unlawful agreements in restraint of trade, in violation of the TTPA.

174.   Plaintiff's TTPA claim is based on the above-described facts.

175.   Plaintiff and members of the Tennessee Sub-Class have been injured in their business and property by reason of Defendants' unlawful combinations, agreements, and conspiracies. Defendants' illegal agreements, combinations or conspiracy resulted in Plaintiff and Tennessee Sub-Class members paying more for disposable contact lenses than they otherwise would have paid absent Defendants' illegal conduct. This injury is of the type the TTPA was designed to prevent. Accordingly, Plaintiff and Tennessee Sub-Class members seek damages to the extent permitted.

176.   Defendants agreements, combinations or conspiracy is a *per se* violation of the TTPA.

177.   During the Class Period, Defendants' illegal conduct, as described in the foregoing paragraphs, substantially affected Tennessee trade and commerce and injured persons and entities who purchased the Manufacturer Defendants' contact lens products from one or more of the Retailer Defendants. Defendants' agreements, combinations, and conspiracies, as described herein, had the following substantial effects on Tennessee commerce:

> • Defendant Wal-Mart operates 113 stores with "vision center" departments in the State of Tennessee;
>
> • Defendant Costco operates at least a dozen warehouses in the State of Tennessee; • There are hundreds of ECPs across the State of Tennessee who prescribe and/or sell the relevant contact lens products made by the Manufacturer Defendants in the State of Tennessee;
>
> • Tens of thousands of Tennesseans purchase the relevant contact lens products made by the Manufacturer Defendants from ECPs, "big box" stores (*e.g.*, those owned by Defendants Wal-Mart Stores, Inc. ("Wal-Mart")), buying clubs (*e.g.*, those run by Defendant Costco

-56-

Wholesale Corporation ("Costco")), and internet-based retailers (*e.g.*, Defendants 1-800-Contacts and LensDiscounters.com); and

• a substantial amount of overcharges paid by Tennessee consumers for relevant contact lens products to ECPs, Wal-Mart, and Costco flowed to those Defendants at their Tennessee locations.

178.    In addition, many of Defendants and conspirators, directly or through their executives, officers, or agents, engaged in the following other activities in or substantially-affecting trade and commerce in the State of Tennessee:

• Transacted relevant contact lens business in Tennessee;

• Sold relevant contact lens in Tennessee;

• Intentionally availed themselves of the benefits of selling relevant contact lens products from Tennessee;

• Produced, promoted, sold, marketed, or distributed relevant contact lens products in or from Tennessee; and

• Derived substantial revenue in Tennessee from relevant contact lens products sold, purchased, used, or consumed throughout the United States.

## COUNT THREE

## UNJUST ENRICHMENT

179.    Plaintiff incorporates and re-alleges each allegation set forth in the preceding paragraphs of this complaint.

180.    Defendant has benefitted from its unlawful acts through the overpayments for relevant contact lens products by Plaintiff and the other Class members and the increased profits resulting from such overpayments paid to Defendants (and shared by Defendants with their co-conspirators) as part of the unlawful agreements, as set forth herein.  It would be inequitable for Defendants to be

-57-

permitted to retain the benefit of these overpayments conferred on them by Plaintiff and the Class and retained by Defendants.

181. By reason of their unlawful conduct, Defendants should make restitution to Plaintiff and Class members. To the extent Plaintiff is required to have exhausted administrative remedies before bringing an unjust enrichment claim, exhaustion of any such remedies is not required in this instance because: (a) the issues are of the type that would be appropriate for judicial determination, and (b) applying the doctrine here would result in substantial financial hardship, inequity and economic inefficiency and would violate public policy. Further, any action which might have been taken by Plaintiff to pursue administrative remedies would have been futile.

182. In equity, Defendants should not be allowed to retain the economic benefit derived from said improper conduct and should be ordered to pay restitution and prejudgment interest to Plaintiff and Class members.

## IX. JURY DEMAND

183. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all of the claims asserted in this Complaint so triable.

## X. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays:

A. That the summons be issued and that Defendants be duly served with a copy of this Complaint and required to answer same, and that this Court decree and enter judgment;

B. That the Court certify the Class as proposed and appoint the Plaintiff as representative of the Class (and where appropriate, subclass representatives) and their counsel as Class and subclass Counsel;

-58-

C.      Defendants have engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), the TTPA, and state common law of unjust enrichment, and that Plaintiff and the members of the Class (or where appropriate, subclasses) have been injured in their business and property as a result of Defendants' violations;

D.      Plaintiff and the members of the Class (or, where appropriate, subclasses) recover damages sustained by them, as provided by the federal antitrust laws, and the TTPA, including full consideration under § 47-25-106 of the Tennessee Trade Practices Act, and that a judgment in favor of Plaintiff and the Class be entered against the Defendants in an amount to be trebled to the extent such trebling is permitted pursuant to such laws;

E.      Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

F.      Plaintiff and members of the Class (or, where appropriate, subclasses) be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

G.      Plaintiff and members of the Class (or, where appropriate, subclasses) recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

H.      Plaintiff and members of the Class (or, where appropriate, subclasses) receive such other or further relief as may be just and proper.

Dated: March 18, 2015.

/s/    W. Allen McDonald, Esq.
W. Allen McDonald, Esq.
**LACE, PRICE & WAGNER**
249 N. Peters Road, Suite 101
Knoxville, TN 379234917
Tel: 865-246-0800

/s/ Christopher T. Cain
Christopher T. Cain (TN BPR# 19997)
**SCOTT & CAIN**
Bank of America Center, Suite 601
550 Main Street
Knoxville, Tennessee 37902
Tel: 865-525-2150

*Counsel for Plaintiff and Class*

-60-